IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00056-LTB

AUTO-OWNERS INSURANCE CO.,

  Plaintiff,

v.

GLEN M. NICOLETTI

  Defendant.

---

## AUTO-OWNERS INSURANCE CO.'S MOTION FOR SUMMARY JUDGMENT

---

  Plaintiff, Auto-Owners Insurance Co. ("AOI"), by and through its undersigned counsel, The Hustead Law Firm, A Professional Corporation, hereby submits the following its Motion for Summary Judgment Pursuant to F.R.C.P. 56, and states as follows:

**I.**  <u>**CERTIFICATION**</u>

Pursuant to D.C.Colo.LCiv.R 7.1(3), conferral is not required for this motion.

**II.**  <u>**INTRODUCTION**</u>

  This case stems from claims asserted against Defendant, Glen Nicoletti, ("Nicoletti") in a civil lawsuit filed in Douglas County District Court, State of Colorado, Case No. 2019CV039086, styled *Colin Olson v. Glen Nicoletti*, hereinafter referred to as the "Underlying Lawsuit."

  In the Underlying Lawsuit, Colin Olson ("Olson") brought suit against Nicoletti for personal injury claims arising out of an intentional double stabbing by Defendant Glen Nicoletti ("Nicoletti) on his then son-in-law Olson that occurred on December 3, 2018 while Nicoletti, Olson and two other family members were vacationing together in Puerto Vallarta, Mexico.

  At the time of the attack, Nicoletti was insured by AOI under two relevant insurance

1

policies: a homeowner's insurance policy and an umbrella policy (collectively, the "Policies").  On November 21, 2019, Nicoletti tendered defense of the Underlying Lawsuit to AOI, asserting that the claims against Nicoletti in the Underlying Lawsuit were covered by one or both of the Policies. In response, AOI agreed to defend Nicoletti in the Underlying Lawsuit pursuant to a strict Reservation of Rights.  AOI subsequently filed this action seeking a declaration that it does not owe any coverage obligations or payments to Nicoletti under any applicable insurance policy for the attack that occurred in Mexico.  Insurance does not cover attempted murder.

In this Motion, AOI seeks a determination from this Court that AOI does not have a duty to defend or indemnify Nicoletti in the Underlying Lawsuit and that the plain and unambiguous language of the applicable insurance policies preclude coverage of the personal injury claims asserted against Nicoletti in the Underlying Lawsuit.

### III.    STATEMENT OF FACTS

On the morning of December 2, 2018, Nicoletti, Olson, Nicoletti's wife, Kimberly Nicoletti ("Kim"), and Olson's then-wife and Nicoletti's daughter, Kristin Olson ("Kristin") (collectively, the "Family"), travelled from Colorado to Puerto Vallarta, Mexico for a family vacation.  The Family stayed in a two-bedroom hotel unit (the "Hotel") together, with Olson and Kristin in one room and Nicoletti and Kim in another.

Throughout the day on December 3, 2018, the Family consumed numerous beverages both at the Hotel and in Old Town Puerto Vallarta.  Nicoletti consumed several beers and margaritas as well as approximately twenty samples of tequila at a local tequila tasting room.  By the time the Family left Old Town Puerto Vallarta to go back to the Hotel, all four individuals were exceptionally intoxicated.  Kim was so inebriated she was unable to walk properly and passed out in the Uber on the way back to the Hotel.

Upon returning to the Hotel that evening, Nicoletti, Olson and Kristin continued to consume alcohol at a crippling rate. They consumed beer as well as the tequila that they had purchased earlier that day. Kim was unable to participate in the festivities as she was passed out on the couch from all the alcohol that she had consumed throughout the day.

After approximately two hours of drinking alcohol in the hotel room, Olson left the room to purchase cigarettes at a convenience store located near the hotel. Both Nicoletti and Kristin were awake and still consuming alcohol when Olson left the hotel room. At some point after Olson had purchased the cigarettes and before he returned to the Hotel, Olson made contact with a local Puerto Vallarta man, which led to Olson agreeing to purchase cocaine.

Approximately two hours passed before Olson returned to the Hotel with the cocaine and cigarettes. During the course of the cocaine purchase, Kristin had been trying to call and text Olson to figure out where he was. Olson ignored Kristin's numerous texts and calls, which caused Kristin and Nicoletti to become extremely worried about Olson's wellbeing.

When he returned to the Hotel, Olson was excited and anxious as a result of purchasing cocaine in a foreign county. Nicoletti, however, was not amused. He was furious that Olson purchased street drugs and brought them back to the Hotel. He was also incensed that that Olson had upset his daughter by not answering her phone calls and texts. At this point the drunken party segued into a horror story.

Without provocation from Olson, Nicoletti pursued Olson throughout the hotel room wielding a kitchen knife and yelling profanities at him. Then, in a fit of rage, Nicoletti began stabbing Olson. Seeing what was going on, Kristen flung herself between her husband and his assailant, her father. The knife was wrestled away from Nicoletti. Undeterred by Kristen's valiant efforts to save her husband, Nicoletti grasped another, larger knife, and reached around his

daughter and stabbed the defenseless and bleeding Olson a second time in the chest.

In Colorado, second degree attempted murder has a minimum sentence of ten years in jail. Presumably the experience in Mexico is worse, if for no other reason than the accommodations are less appealing. Further, it is not a crime in Colorado to stab your son in law in Mexico. Extradition to Mexico for a *gringo en gringo* crime is almost never heard of. Thus, shortly after stabbing Olson, Nicoletti, realizing what he had done, fled the country before daybreak, returning to the United States and the comforts of home on the first flight back from Mexico. Olson, left by Nicoletti to die in a Mexican hotel room, was transported via ambulance to a local Mexican hospital, where he was hospitalized in the Intensive Care Unit ("ICU") for approximately five days before returning to the United States for further treatment.

Six weeks after the attack, on January 20, 2019, Nicoletti admitted his guilt in stabbing Olson but claimed that he could remember neither the events leading up to the attack not the attack itself. He claims that because of his voluntary decision to mix prescription sleep medication with alcohol, he blacked out and has no memory of the brutal attack. Tellingly, Nicoletti offered to pay, and did pay, for Olson's outstanding medical expenses and lost wages as a result of the stabbing despite his fabricated story that he could not recall his attempt to murder Mr. Olson.

Unsurprisingly, there is no coverage for trying to kill someone. Neither the homeowner's insurance policy nor the umbrella policy provide liability coverage for Olson's injuries. They were not caused by any kind of accident and were the result of the inexcusable intentional acts of Nicoletti. As a result, AOI has neither a duty to defend nor the obligation to indemnify Nicoletti in the Underlying Lawsuit and is entitled to a court order saying it.

### IV.   UNDISPUTED MATERIAL FACTS

The following facts are undisputed for the purposes of this Motion:

1.      Olson filed the Complaint in the Underlying Lawsuit on November 22, 2019.  A copy of the Complaint is attached hereto as **Ex. A**.

2.      On December 3, 2019, Nicoletti was vacationing in Puerto Vallarta, Mexico with his wife, Kim Nicoletti, his daughter, Kristin Olson, and his then son-in-law, Colin Olson.  *See* Nicoletti's Deposition Testimony at 33:7-20, a copy of which is attached hereto as **Ex. B**.

3.      Nicoletti shared a two-bedroom hotel unit with Kim, Kristin and Olson.  *See* Olson's Deposition Testimony at 98:14-17, a copy of which is attached hereto as **Ex. C**.

4.      During the day on December 3, 2018, Nicoletti consumed several alcoholic beverages.  *See* **Ex. B** at 33:7-15; 34:18-23; 35:10-15; 36:9-16.

5.      When Nicoletti returned to the hotel unit in the evening of December 3, 2018, he was intoxicated.   *See* **Ex. C** at 117:1-9; *see also* Nicoletti's Supplemental Response to Interrogatory No. 1, attached hereto as **Ex. D**.

6.      Nicoletti continued to consume alcoholic beverages in the hotel unit on the evening of December 3, 2018.  *See* **Ex. B** at 35:13-15; *see also* **Ex. C** at 120:14-19; Kristin's Deposition Testimony at 72:8-10, a copy of which is attached hereto as **Ex. E**.

7.      In the evening of December 3, 2018, Nicoletti ingested prescription Lunesta after becoming intoxicated.  *See* **Ex. B** at 36:20-21; *see also* Email Correspondence dated January 29, 2019 between Nicoletti and Olson at p. 3, a copy of which is attached hereto as **Ex. F**.

8.      Nicoletti knew that ingesting prescription medication after consuming alcoholic beverages could have adverse effects.  *See* **Ex. B** at 68:2-7; *see also* **Ex. D** at Nicoletti's Supplemental Responses to Interrogatory No. 2.

9.      On the evening December 3, 2018, Olson left the hotel unit to purchase cigarettes. *See* **Ex. C** at 122:4-6; *see also* **Ex. E** at 78:8-9.

10.     Colin returned to the hotel unit with cocaine.  *See* **Ex. C** at 130:17-19; 141:11-12; *see also* **Ex. E** at 81:1-4.

11.     Nicoletti was angry that Colin brought cocaine into the hotel unit.  *See* **Ex. E** at 73:12-14, 99:1-2; 99:7-12; *see also* **Ex. C** at 154:24-155:19.

12.     Nicoletti did not like the way Olson treated and/or talked to Kristin.  *See* **Ex. C** at 166:9-15; **Ex. E** at 94:2-9; *see also* **Ex. D** at Plaintiff's Supplemental Response to Request for Admission No. 4.

13.     On the evening of December 3, 2018, Nicoletti stabbed Olson with a knife two times.  *See* **Ex. C** at 75:21-76:2; 105:2-5; 143:3-5; 144:6-9; 173:17-20; **Ex. E** at 103:6-7; 148:1-5; *see also* the translated Police Report dated December 4, 2018 at p. 2, a copy of which is attached hereto as **Ex. G**.

14.     Kristin attempted to stop Nicoletti from attacking Olson.  *See* **Ex. C** at 159:15-17; **Ex. E** at 73:15-22.

15.     Olson was hospitalized following the stabbing incident.  *See* **Ex. C** at 146:20-147:2; **Ex. E** at 100:16-21; 102:11-13; **Ex. G** at p. 2.

16.     Nicoletti fled Mexico on the morning of December 4, 2018.  *See* **Ex. B** at 37:19-25, 39:10-14, 44:5-9, 65:20-21; *see also* **Ex. D** at Plaintiff's Supplemental Response to Request for Admission No. 13; **Ex. F** at p. 5.

17.     Nicoletti did not speak to Kristin or Kim prior to departing Mexico.  *See* **Ex. B** at 39:10-17.

18.     Nicoletti returned to the United States on December 4, 2018.  *See* **Ex. B** at 120:10-14.

19.     On January 20, 2019, Nicoletti sent Olson an email apologizing for stabbing Olson

6

in Mexico.  *See* **Ex. F** at pp. 2, 8.

20.     Nicoletti paid approximately $31,167.34 to Olson for his medical expenses and lost wages following the stabbing.  *See* **Ex. D** at Plaintiff's Supplemental Response to Interrogatory No. 7; *see also* **Ex. B** at 47:14-16; **Ex. F** at p. 7.

21.     AOI issued a Homeowner's Insurance Policy No. 47-588453-04 and Umbrella Policy No. 47-588453-07 to Nicoletti.  A copy of the Homeowner's Insurance Policy and Umbrella Policy is attached hereto as **Ex. H** and **I**, respectively.

22.     The Homeowner's Policy defines the term "occurrence" as "an accident that results in bodily injury . . . and includes, as on occurrence, all continuous or repeated exposure to substantially the same generally harmful conditions."  *See* **Ex. H** at p. 16, ¶ 8.

23.     The Homeowner's Policy contains an exclusion for "bodily injury . . . reasonably expected or intended by an insured" and "applies even if the bodily injury . . . is of a different kind or degree, or is sustained by a different person or property, than is reasonably expected or intended."  *Id.* at p. 17, ¶ (12).

24.     The Homeowner's Policy contains an endorsement that states "this [expected or intended bodily injury] exclusion does not apply to bodily injury . . . arising out of the use of reasonable force by the insured to protect persons or property."  *Id.* at p. 64, Form 57591 (2-14).

25.     The Umbrella Policy contains an exclusion for bodily injury that is "expected or intended by the insured."  *See* **Ex. I** at p. 4, ¶ (d).  The exclusion states that the Umbrella Policy "cover[s] assault and battery committed to protect persons or property."  *Id.*

26.     Olson did not testify that Nicoletti was protecting her when he stabbed Olson.  *See* **Ex. C** at 143:1-3; 144:5-9.

27.     Similarly, Kristin did not testify that Nicoletti was protecting Kristin when Nicoletti

stabbed Olson.  *See* **Ex. E** at 73:15-20; 83:2-23.

28.     Thus, there is no evidence, aside from his self-serving allegations, that Nicoletti was defending Kristin (or anyone else) when he attacked Olson.

## V.      LEGAL STANDARD

Summary judgment shall be granted if the evidence indicates "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See* Fed. R. Civ. P. 56(c); *see also Celotex v. Cattret*, 477 U.S. 317, 322 (1986).  Summary judgment is an integral part of the rules of procedure designed to secure the just and inexpensive determination of every action.  *Celotex*, 477 U.S. at 327; *see also Continental Airlines, Inc. v. Kennan*, 731 P.2d 708, 712 (Colo. 1987) (applying *Celotex* in Colorado).  When a motion for summary judgment is made and supported under Colorado Rule of Civil Procedure 56, the opposing party, "may not rest upon mere allegations or denial in its pleadings, but must provide specific facts demonstrating the existence of a genuine issue for trial."  *Meyerstein v. City of Aspen*, 282 P.3d 456, 461 (Colo. App. 2011).  If the nonmoving party cannot muster sufficient evidence to make out a triable issue of fact on his claim, a trial would be useless, and the moving party entitled to summary judgment as a matter of law.  *Continental Air Lines, Inc. v. Keenan*, 713 P.2d 708, 713 (Colo. 1987).

## VI.      ARGUMENT

### A.      The Plain and Unambiguous Terms of the Policies Preclude Coverage of the Claims against Nicoletti in the Underlying Lawsuit.

To ascertain whether coverage exists under an insurance policy, courts must examine the policy language and give effect to the plain and ordinary meaning of the policy terms.  *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 293 (Colo. 2005).  Courts "examine and construe the policy in harmony with the plain, popular and generally accepted meaning of the words

employed and with reference to all provisions of the document." *Wota v. Blue Cross and Blue Shield*, 831 P.2d 1307, 1309 (Colo. 1992). "When faced with terms in an insurance policy that are not defined [Colorado law] dictates that such terms be given their plain, ordinary meaning and interpreted according to the understanding of the average purchaser of insurance." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 617 (Colo. 1999).

The interpretation of a contract, including a contract for insurance, is a matter of law. *Gen. Ins. Co. of. Am. v. Smith*, 874 P.2d 412, 414 (Colo. App. 1993). The terms of an insurance contract are interpreted in accordance with general rules of contract interpretation and should be construed to promote the intent of the parties. *Allstate Ins. Co. v. Starke*, 797 P.2d 14, 17 (Colo. 1990). The policy must be enforced as written unless there is an ambiguity in the policy language. *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1359 (Colo. 1993). Moreover, a mere disagreement between the parties regarding the interpretation of the policy does not create an ambiguity. *Terranova v. State Farm Mut. Auto. Ins. Co.*, 800 P.2d 58, 60 (Colo. 1990).'

## 1.   Olson's Injuries in the Underlying Lawsuit Were Not Caused by an Occurrence.

The Homeowner's Policy defines "occurrence" as "an accident that results in bodily injury . . . and includes, as one occurrence, all continuous or repeated exposure to substantially the same generally harmful conditions." *See* **Ex. G** at p. 16, ¶ 8.[1] Although the Homeowner's Policy does not define the term "accident," Colorado courts have defined "accident" as "an unanticipated or unusual result flowing from a commonplace cause." *Carroll v. CUNA Mut. Ins. Soc.*, 894 P.2d 746, 753 (Colo. 1995); *see also Greystone Const., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1278 (10th Cir. 2011) (applying the definition of "accident" in *Carroll*, 894 P.2d at 753). Olson's injuries did not arise out of "an unanticipated or unusual result flowing from a

---

[1] The Umbrella Policy does not include a separate definition of the term "occurrence."

commonplace cause" because Nicoletti did not accidentally stab Olson two times.  As a result, AOI does not have a duty to defend or indemnify Nicoletti against Olson's claims.

The Tenth Circuit Court of Appeals failed to find an occurrence in a case with facts analogous to the case at issue here.  *See Shelter Mut. Ins. Co. v. Wheat*, 313 Fed.App'x 76 (10th Cir. 2008); *see also Garrison Prop. and Cas. Ins. Co. v. Barco*, 2011 WL, at *2 (D. Colo. 2011) ("[W]hen an individual deliberately aims a loaded gun at someone and pulls the trigger, the shooter intends or expects to cause some harm…"); *Mass. Bay Ins. Co. v. Gordon*, 708 F.Supp. 1232, 1234 (W.D. Okla. 1989) (finding no occurrence for the insured's assault and battery of another individual because "[r]egardless of [the insured's] subjective intent, [his victim's] injury was the natural, reasonably foreseeable, and to-be-expected result of [the insured's] violent assault upon him").

In *Wheat*, the insured arrived at Ms. Wheat's house with the intent to frighten her son after learning that Ms. Wheat's son was involved in a domestic dispute with the insured's daughter.  *Id.* at 77.  The insured had been drinking prior to his arrival at the Wheat's home.  *Id.*  Upon his arrival, the insured grabbed his gun and headed toward the house.  *Id.*

The witness accounts of what happened next differ significantly.  The court explained, however, that the discrepancies between the differing stories did not arise to level of a genuine dispute of material fact so as to preclude summary judgment in favor of Shelter Mutual Insurance Company ("Shelter").  *Id.* at 78.

In sum, the insured approached a sliding glass door where Mrs. Wheat and her son appeared.  *Id.*  The insured attempted to get into the house, but Mrs. Wheat and her son resisted. *Id.*  Frustrated, the insured shot his gun toward the sliding glass door, shattering the glass door.  *Id.* The bullet from the insured's pistol ricocheted into Mrs. Wheat's chest, collapsing her lung.  *Id.*

10

The insured had a homeowner's insurance policy with Shelter entitled "Comprehensive Personal Liability Protection," which provided that Shelter would "pay all sums arising out of any one loss which an insured becomes legally obligated to pay as damages because of bodily injury . . . and caused by an occurrence covered by the policy." *Id.* at 79. Under that policy, an "occurrence" was defined as "an accident including injurious exposure to conditions, which results, during the policy term, in bodily injury or property damage." *Id.* The policy specifically excluded bodily injury expected or intended by the insured. *Id.*

Mrs. Wheat argued that "although the *means* [the insured] employed may not have been 'accidental,' the *result* was an 'accident'" such that coverage should apply to her injuries. *Id.* at 80 (emphasis in original). The Tenth Circuit Court of Appeals rejected Mrs. Wheat's argument, finding that the shooting that resulted in Mrs. Wheat's injuries was not an accident within the meaning of the policy. Relying on the definition provided in *U.S. Fid. & Guar. Co. v. Briscoe*, 239 P.2d 754 (Okla. 1951), the court determined that an "accident" was "an event from an unknown cause, or an unexpected event from a known cause"; "[a]n unusual or unexpected result, attending the performance of a usual or necessary act"; and "an event which the actor did not intend to produce." *Id.* at 80 (internal citations omitted).

The court noted that "[i]t was not an unnatural or unforeseeable consequence of firing at close range in the vicinity of Mrs. Wheat and with the intention of scaring her away, that a ricochet bullet could have hit and injured her." *Id.* at 82. Accordingly, Mrs. Wheat's injuries were not caused by an occurrence and summary judgment in favor of Shelter was affirmed. *Id.*

Here, like in *Shelter* and *Gordon*, Olson's injuries were not caused by an accident. Nicoletti was obviously attempting to murder his son in law. Both Olson and Nicoletti's daughter, Kristin, testified that Nicoletti was angry when Olson returned to the hotel unit with cocaine. *See* **Ex. E** at

73:12-13, 99:1-2; 99:7-12; *see also* **Ex. C** at 154:24-155:19.   Additionally, Nicoletti was angry with Olson because he did not like the way that Olson treated Kristin.  *See* **Ex. C** at 166:9-15; **Ex. E** at 94:2-3; *see also* **Ex. D** at Plaintiff's Supplemental Response to Request for Admission No. 4. Acting on this anger, Nicoletti intentionally grabbed a knife and stabbed Olson *twice*, resulting in Olson's severe and life-threatening injuries.  *See* **Ex. C** at 75:21-76:2; 105:2-5; 143:3-5; 144:6-9; 173:17-20; **Ex. E** at 103:6-7; 148:1-5; **Ex. G** at p. 2.   Even if Nicoletti did not intend to seriously injure Olson (which he did), Nicoletti did intend the offensive conduct of wielding a knife and thrusting it in Olson's direction, which was certain to result in serious injury to Olson.  *See Shelter*, 313 Fed.App'x at 82.

Nicoletti claims, however, that he was intoxicated and on drugs at the time of the stabbing and thus, conveniently, cannot recall anything that happened.  *See* **Ex. B** at 52:11-14; **Ex. C** at 117:1-9.   Regardless of Nicoletti's subjective intent at the time he stabbed Olson, however, Nicoletti obviously understood the seriousness of his actions when he immediately fled Mexico and flew back to the United States.  *See* **Ex. B** at 37:19-25, 39:10-14, 44:5-9, 65:20-21; **Ex. D** at Plaintiff's Supplemental Response to Request for Admission No. 13; **Ex. F** at p. 5.   Indeed, Nicoletti fled Mexico without speaking to Kim or Kristin, and stated that he left to avoid being thrown in a Mexican jail.  *See* **Ex. B** at 39:10-17; 44:5-9.   To further demonstrate that he understood the seriousness of stabbing Olson, Nicoletti later confessed that "his instincts" told him that he needed to get out of Mexico immediately as a result of stabbing Olson.  *See* **Ex. F** at p. 5. Finally, Nicoletti paid Olson's medical expenses and lost wages, despite his later claim that he did not stab Olson, (*See* **Ex. D** at Plaintiff's Supplemental Response to Interrogatory No. 7) and apologized on multiple occasions for the Incident.  *See* **Ex. E** at 152:6-16; **Ex. F** at p. 8.

If Nicoletti was truly innocent of stabbing Olson, it begs the question as to why he would

immediately flee Mexico, later pay Olson's expenses associated with the stabbing, and profusely apologize for the Incident.  Innocent people simply do not behave the way that Nicoletti behaved following the Incident.  Plus, both his daughter and his former son-in-law have unequivocally testified that Nicoletti stabbed Olson.

Nicoletti did not accidentally stab Olson.  He did not like the way that Olson treated Kristin (*See* **Ex. C** at 166:9-15; **Ex. E** at 94:2-3; **Ex. D** at Supplemental Response to Request for Admission No. 4)  and was angry with Olson for bringing illicit drugs into the hotel unit.  *See* **Ex. E** at 73:12-14, 99:1-2; 99:7-12; **Ex. C** at 154:24-155:19.  Consumed with rage, Nicoletti made the decision to grab two separate knives and thrust them not once, but twice, into Olson's corpus.  Stabbing an individual with a knife cannot be construed as an "unanticipated or unusual result" flowing from thrusting a knife in that individual's direction, regardless of whether or not Nicoletti was intoxicated.  *See Shelter*, 313 Fed.App'x at 80; *see also Gordon*, 708 F.Supp. at 1234.

In his Response, Nicoletti will likely make much ado about the order in which the stabbings occurred and/or the location of where the stabbings occurred in an attempt to create a genuine issue of material fact.  Like in *Shelter*, however, any minor discrepancies in the differing stories between Kristin and Olson do not change the fact that Nicoletti was angry with Olson and intentionally and savagely stabbed him two times.  *See Shelter*, 313 Fed.App'x at 78.  Thus, any minor discrepancies between any differing stories cannot and do not arise to the level of a genuine dispute of material fact so as to preclude summary judgment in favor of AOI.  *Id.*

Olson's claims against Nicoletti in the Underlying Lawsuit are barred because Olson's injuries were not caused by an "occurrence" within the meaning of the Policies.  As a result, Olson's injuries are not covered by the Policies, and AOI does not have a duty to defend or indemnify Nicoletti in the Underlying Lawsuit.

2.      **The Policies' Expected or Intended Injury Exclusion Bars Coverage for the Claims Against Nicoletti**

Even if the Court does finds that the attempted murder was an accident, the "expected or intended injury" exclusion comes into play and voids coverage.  The intentional tort exclusion is "designed to prevent indemnifying an insured against loss of the same general type as the insured intended."  *USAA Cas. Ins. Co. v. Hancock*, 2014 WL, at *4 (D.N.M. 2014).   Both the Homeowner's Policy and Umbrella Policy contain an exclusion that precludes coverage for bodily injury that is "expected or intended by the insured." *See* **Ex. H** at p. 17, ¶ (12); **Ex. I** at p. 4, ¶ (d). Both Policies have an exception, however, that bodily injury arising out of the use of force by the insured to protect persons or property *is* covered.  *See* **Ex. H** at p. 64, Form 57591 (2-14); **Ex. I** at p. 4, ¶ (d).  Regardless of this exception to the expected or intended injury exclusion, however, AOI does not have a duty to defend Nicoletti in the Underlying Lawsuit because Nicoletti was not defending persons or property when he savagely stabbed Olson.

In *Butler v. Behaeghe*, the Colorado Court of Appeals found that a similar "expected or intentional injury" exclusion barred coverage of an insured's assault claim under a homeowner's insurance policy.  548 P.2d 934 (Colo. App. 1976).  There, the insured struck the victim in the head with a steel pipe.  *Id.* at 936.  The victim prevailed in an assault action against the insured and thereafter sought to garnish the insured's homeowner's policy.  *Id.*  The carrier denied coverage under the expected or intended injury exclusion.  *Id.* at 937.  The victim argued that the exclusion should not apply because the insured testified that he intended to strike the victim in the stomach with the steel pipe, he did not intend to strike him in the head.  *Id.* at 938.  As a result of the plaintiff ducking, however, the insured struck the victim in the head.  *Id.*

The *Butler* court was not persuaded by the victim's argument that the insured must intend or expect to produce the specific damage which occurred.  *Id.*  In making its determination, the

Court of Appeals quoted the reasoning of a Nebraska opinion:

> Under the language of the exclusion in question, an injury is either expected or intended if the insured acted with the specific intent to cause harm to a third party.  It seems to use to be immaterial whether the injury which results was specifically intended, i.e., the exclusion would apply even though the injury is different from that intended or anticipated.

*Id.* at 939 (quoting *State Farm & Cas. Co. v. Muth*, 248 N.W.2d 364 (Neb. 1973).  In accordance with such reasoning, the court noted that because the insured intended to strike the plaintiff, he must be deemed to have intended the ordinary consequences of his voluntary action.  *Id.*  Since some injury was intended, the court concluded, "it is immaterial that the particular injury that resulted was not specifically intended."  *Id.* Thus, the *Butler* court determined that the intended or expected injury exclusion barred coverage.  *Id.*

Pursuant to the reasoning in *Butler*, Nicoletti not intending to stab Olson is immaterial.  He obviously intended to cause some injury to Olson when he plunged a knife into his chest, and this after having already stabbed him near is femoral artery in his thigh.   *See* **Ex. C** at 173:19-20; **Ex. E** at 103:6-7; 148:1-5; **Ex. G** at p. 2.  Any reasonable person would expect that wielding a knife and ramming it into someone's body would cause some type of injury.  *See Bulter*, 548 P.2d at 939.  Additionally, Nicoletti understood the gravity of his actions when he immediately fled the country back to the United States without speaking to his family or attempting to find out what happened to Olson.  *See* **Ex. B** at 39:10-17; 44:5-9.  Thus, as Nicoletti intended to cause some injury to Olson, pursuant to the rule of *Butler*, it is undisputed that he intended the ordinary consequences of his voluntary action: the knife going into Olson's body.

Further, Nicoletti was not defending any other individuals or the property when he attacked Olson.  *See* **Ex. C** at 143:1-3; 144:5-9; *See* **Ex. E** at 73:15-17; 83:2-23.  The Complaint in the Underlying Lawsuit specifically states that Nicoletti, "*without provocation*, immediately

confronted [Olson] and began screaming at [Olson] and threatening him." *See* **Ex. A** at ¶ 10.  This allegation is supported by Kristin and Olson's deposition testimony that Nicoletti was angry with Olson for purchasing cocaine while in Mexico and bringing it back to the hotel unit where Nicoletti and his family were staying.  *See* **Ex. E** at 73:12-14, 99:1-2; 99:7-12; *see also* **Ex. C** at 154:24-155:19.

Additionally, both Kristin and Olson testified that after the first stabbing, Kristin attempted to stop Nicoletti from further attacking Olson.  *See* **Ex. C** at 159:15-17; **Ex. E** at 73:15-22.  There was no altercation between Kristin or Olson such that Nicoletti needed to intervene.  *See* **Ex. E** at 99:4-6.  Indeed, neither Kristin nor Olson testified that Nicoletti was protecting Kristin when he stabbed Olson.  *See* **Ex. C** at 143:1-3; 144:5-9; *See* **Ex. E** at 73:15-17; 83:2-23.  Nicoletti has no evidence, other than his own self-serving assertions, which of course conflict with his story about having blacked out, to support such a claim.  Thus, Nicoletti was not protecting Kristin, or anyone/anything else, when he brutally attacked Olson.

Finally, Nicoletti claims that he cannot recall anything that happened on the night of December 3, 2018 because he combined prescription Lunesta and alcohol, which caused gaps in his memory.  *See* **Ex. F** at pp. 2-3.  The evidence clearly establishes, however, that Nicoletti was **<u>not</u>** so intoxicated that he lacked the capacity to form the intent to harm Olson, and manage the coordination to sink the knife in twice even though his daughter was actively fighting for her husband and trying to prevent him from being murdered by her father.  Indeed, exhibiting signs of intoxication is different from the inability to form an intent to injure.  In other words, being drunk or on drugs is not a defense to an intentional act, such as attempted murder.

In *Hancock*, 2014 WL 11619165, at *1, the New Mexico District Court upheld the expected or intentional injury exclusion where an insured, while intoxicated, shot another individual.  *Id.* at

*2. After the shooting, the insured told the police that he remembered parts of the events of the evening but had gaps in his memory. The insured told the police that he recalled firing his weapon at someone but did not know why. *Id.*

The court found that the shooting, regardless of subjective intent, was "inherently harmful, performed voluntarily, and the [victim's] gunshot wounds . . . were the natural result of the shooting. *Id.* at *4. Additionally, the court noted that after the shooting, the insured told the police that he remembered firing his gun at someone. The court reasoned that although the insured may not have intended to shoot the victim, he intended to shoot *someone*, and that the shooting of the victim was the same general type of harm that the insured intended. *Id.* As a result, the court concluded that the expected or intended injury exclusion applied. *Id.*

Here, Nicoletti's actions in grabbing a knife, stabbing Olson once and subsequently stabbing Olson a second time in the chest with a different knife, despite his own daughter's valiant attempts to stop him, were inherently harmful, performed voluntarily, and Olson's resulting injuries were the natural result of Nicoletti stabbing Olson. *Hancock*, 2014 WL 11619165, at *4. Further, Nicoletti understood the seriousness of his actions by immediately fleeing Mexico without speaking to either his wife or daughter. *See* **Ex. B** at 39:10-17, 44:7-9; **Ex. F** at p. 5.

Thus, Nicoletti did not lack the capacity to form the intent to harm Olson and knew that stabbing him was serious enough to escape Mexico and flee back to the United States. Accordingly, because Nicoletti intended to seriously injure Olson by stabbing him two times, the expected or intended injury exclusions applies and coverage for Olson's injuries are barred.

All of this caselaw support the central idea that one cannot purchase insurance to transfer the risk of liability for damages to an insurance company. Bank robbers cannot get insurance to protect them from lawsuits by people they kill or for damage to the safes they blow up. Killers

cannot get insurance to protect their savings from the people they kill (or simply maim, as here.) People that commit heinous crimes against other humans cannot get insurance to keep their assets safe.  It is against public policy and offensive to our system of justice.

### VII.   CONCLUSION

Olson's claims against Nicoletti in the Underlying Lawsuit are not covered by Nicoletti's insurance because Olson's injuries were not caused by an "occurrence" within the meaning of the Policy.  Nicoletti intentionally tried to murder Olson, savagely stabbing him in the thigh and chest, resulting in Olson's injuries.  Nicoletti escaped justice by fleeing Mexico to avoid his well-deserved prosecution by Mexican authorities.  Nicoletti's actions were not accidental.  Thus, Olson's injuries were not caused by an occurrence and are therefore not covered by the Policies.

Further, the Policies at issue in this case contain a clear and unambiguous exclusion barring coverage for the claims asserted against Nicoletti.  Nicoletti intentionally stabbed his son-in-law because he was in an alcohol and drug fueled rage.  Thus, the Expected or Intended Injury Exclusion of the Policies bars coverage for Olson's claims against Nicoletti in the Underlying Lawsuit.

For these reasons, AOI respectfully requests that this Court grant AOI's Motion for Summary Judgment, that it find that the claims asserted against Nicoletti in the Underlying Lawsuit are precluded from coverage, that AOI has no duty to defend Nicoletti from any such claims, and for such other and further relief as the courts deems just and proper.

Respectfully submitted this 18th day of September, 2020.

THE HUSTEAD LAW FIRM
*A Professional Corporation*
*Original signature is on file at*
*The Hustead Law Firm, A Professional Corporation*


*s/ Patrick Q. Hustead*
Patrick Q. Hustead, Esq.
Connor L. Cantrell, Esq.
Jordan M. Quick, Esq.
THE HUSTEAD LAW FIRM, *A Professional Corporation*
4643 South Ulster Street, Suite 1250
Denver, Colorado 80237
Telephone: (303) 721-5000
pqh@thlf.com
clc@thlf.com
jmq@thlf.com
*Attorneys for Plaintiff Auto-Owners Insurance*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of September, 2020 a true and correct copy of the foregoing **AUTO-OWNERS INSURANCE CO.'S MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Court and served on the following:

Duncan Griffiths, Esq.
Christopher Griffiths, Esq.
Kim Newton, Esq.
Griffiths Law PC
10375 Park Meadows Drive, Suite 520
Lone Tree, Colorado 80124

*Original Signature is on File at*
*The Hustead Law Firm, A Professional*
*Corporation*


*s/Jordan M. Quick*
Jordan M. Quick, Esq.